DOC NO
REC'D/FILED
2017 SEP 13   AM 11: 06
PETER OPPENEER
CLERK US DIST COURT
WD OF WI

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| Ms. Lonnie L. Jackson, aka Ms. Anastacia Sabrina-Loni Jackson, ) ) ) | Case No.: **17-CV-350bbc** |
| Plaintiff, ) ) | **CIVIL RIGHTS COMPLAINT** |
| vs. ) ) | **AMENDED COMPLAINT** |
| Dr. Kevin Kallas, Jeff Anders, Ryan Holmacher, James Greer Mary Muse, Cathy A. Jess, Robert Hable, Gary Ankarlo, Hugh Johnson, Cindy O'Donnell, Mark Wiegerber, and CPS Corey Sabish , and Gender Dysphoria Committee ) ) ) ) ) ) ) ). |  |
| Defendants'. |  |

## FIRST AMENDED COMPLAINT

COMES NOW, plaintiff Lonnie Jackson a/k/a Ms. Anastacia Sabrina-Loni Jackson, ("Plaintiff" or "Jackson") by and through her undersigned counsel, and for her First Amended Complaint against Defendants' Dr. Kevin Kallas ("Kallas"), Jeff Anders ("Anders"), Ryan Holmacher ("HOLMACHER"), James Greer ("Greer"), Mary Muse ("Muse"), Cathy A. Jess ("Jess"), Robert Hable ("Hable"), Gary Ankarlo ("Ankarlo"), Hugh Johnson ("Johnson"), Cindy O'Donnell ("ODonnell"), and Mark Wiegerber ("Weigerber"), CPS Corey Sabish (Sabish), (Collectively "Defendants'") states as follows

1.      This is an action by Ms. Jackson, a transgender male-to-female inmate, presently in the custody of Kettle Moraine Correctional Institution ("KMCI"), who was previously at the Oshkosh Correctional Institution (OSCI), whose constitutional rights has been and continues to be violated by the Defendants' continued and consistent deliberate indifference to Jackson's medical needs.

2.      Ms. Jackson begins this civil rights action under 42 U.S.C. §1983 to seek declaratory and prospective injunctive relief to redress Defendants' "failure to provide Jackson with medically necessary Orchiectomy and sex reassignment surgeries ("SRS") and other treatment in violation of Jackson's rights under Eighth and Fourteenth Amendments to the United States Constitution, Jackson also seeks actual, consequential, compensatory, and punitive damages, as well as Attorneys' fees and costs from Defendants'.

## JURISDICTIONAL STATEMENT

3.      This Court has jurisdiction under 28 U.S.C. Section 1331, as this action arises under the laws and Constitution of the United States, and 28 U.S.C. §2201, as an actual controversy exists within this Court's jurisdiction.

4.      Venue is proper in the Western District of Wisconsin pursuant to 28 U.S.C. §1391, because the majority of the events giving rise to this action occurred in this district and because Defendants' are subject to personal jurisdiction in this district.

5.      The Court has authority under 42 U.S.C. § to award appropriate actual, consequential, compensatory, and punitive damages, and also has authority under 42 U.S.C. §1983 to award attorneys' fees and costs to successful civil rights plaintiff.

## PARTIES

6.     Ms. Jackson is a citizen of Wisconsin currently housed at Kettle Moriane Correctional Institution ("KMCI") located at W9071 Forest Drive, P.O. Box 282, Plymouth, Wisconsin 53070-0282, prior to arriving at (KMCI) plaintiff was in the custody of the Oshkosh Correctional Institution, Located at 1730 West Snell Road, P.O. Box 3310, Oshkosh, Wisconsin 54903-3310.

7.     Ms. Jackson is a transgender woman, meaning that she was born anatomically male, but has a female gender identify and requires medical treatment to better conform her body to that gender identify. She experiences severe dysphoria and mental distress because of the conflict between her male anatomical features and her female gender identify. Ms. Jackson first began feminizing Hormone therapy in January 2013 as a component of treatment for her severe gender dysphoria, yet she still suffers severe dysphoria and Defendants' continue to refuse to allow Jackson to receive the medically necessary surgeries.

8.     Upon information and belief, Defendant Kevin Kallas is a resident of Wisconsin and an adult citizen of the United States. Kallas is employed as the Mental Health Director for the Bureau of Health Services for the Wisconsin department of Corrections ("WDOC") and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Kallas had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Kallas for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

9.     Upon information and belief, Defendant Jeff Anders is a resident of Wisconsin and an adult citizen of the United States. Anders is employed as the Psychiatry Director for the Bureau of Health Services for the Wisconsin department of Corrections

("WDOC") and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Anders had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Anders for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

10.    Upon information and belief, Defendant Ryan Holmacher is a resident of Wisconsin and an adult citizen of the United States. Holmacher is employed as the Medical Director for the Bureau of Health Services for the Wisconsin department of Corrections ("WDOC") and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Holmacher had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Holmacher for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

11.    Upon information and belief, Defendant James Greer is a resident of Wisconsin and an adult citizen of the United States. Greer is employed as the Director of the Bureau of Health Services for the Wisconsin department of Corrections ("WDOC") and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Greer had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Greer for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

1   12.    Upon information and belief, Defendant Mary Muse is a resident of Wisconsin
2   and an adult citizen of the United States. Muse is employed as the Nursing Director for
3   the Bureau of Health Services for the Wisconsin department of Corrections ("WDOC")
4   and is a member of the Gender Dysphoria Committee for the WDOC. Upon information
5   and belief, at all material times, Muse had the authority to implement state laws
6   regarding the treatment of inmates at WDOC facilities, including evaluating prisoner
7   health care issues and denying or granting relief requested by inmates. Plaintiff sues
8   Muse for damages in her personal capacity and for declaratory and injunctive relief in
9   his official capacity.

10   13.    Upon information and belief, Defendant Cathy A. Jess is a resident of Wisconsin
11   and an adult citizen of the United States. Jess is employed as the Deputy Secretary for
12   the Wisconsin department of Corrections ("WDOC") and is a member of the Gender
13   Dysphoria Committee for the WDOC. Upon information and belief, at all material times,
14   Jess had the authority to implement state laws regarding the treatment of inmates at
15   WDOC facilities, including evaluating prisoner health care issues and denying or
16   granting relief requested by inmates. Plaintiff sues Jess for damages in her personal
17   capacity and for declaratory and injunctive relief in his official capacity.

18   14.    Upon information and belief, Defendant Robert Hable is a resident of Wisconsin
19   and an adult citizen of the United States. Hable is employed as the WDOC Deputy
20   Warden for Oshkosh Correctional Institution, and is a member of the Gender Dysphoria
21   Committee for the WDOC. Upon information and belief, at all material times, Hable had
22   the authority to implement state laws regarding the treatment of inmates at WDOC
23   facilities, including evaluating prisoner health care issues and denying or granting relief
24   requested by inmates. Plaintiff sues Hable for damages in his personal capacity and for
25   declaratory and injunctive relief in his official capacity.

15.     Upon information and belief, Defendant Gary Ankarlo is a resident of Wisconsin and an adult citizen of the United States. Ankarlo was employed by the WDOC was a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times Ankarlo had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Ankarlo for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

16.     Upon information and belief, Defendant Cindy O'Donnell is a resident of Wisconsin and an adult citizen of the United States. O'Donnell is employed as the Secretary for the Wisconsin department of Corrections ("WDOC") and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, O'Donnell had the ultimate authority for the operation of the WDOC, including the administration of health care for the inmates. Plaintiff sues O'Donnell for damages in her personal capacity and for declaratory and injunctive relief in his official capacity.

17.     Upon information and belief, Defendant Mark Wiegerber is a resident of Wisconsin and an adult citizen of the United States. Wiegerber is employed as the Security Chief for the WDOC is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times Wiegerber had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Wiegerber for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

18.     Upon information and belief, Defendant Corey Sabish, is a resident of Wisconsin and an adult citizen of the United States. Sabish is employed as the Institutional Corrections Program Supervisor, who has the authority to make housing unit assignments for all Transgender prisoners at (KMCI). Upon information and belief, at all material times Sabish housing assignments, and cell-mate for all transgender prisoner at WDOC facilities, and denying or granting relief requested by inmates. Plaintiff sues Sabish for damages in his personal capacity and for declaratory and injunctive relief in his official capacity.

19.     The WDOC Gender Dysphoria Committee was established under WDOC Division of Adult Institutions Policy 500.70.27. The purpose of the Gender Dysphoria Committee is to evaluate claims from inmates with gender dysphoria and to determine the necessary method of treatment. Defendants' Kevin Kallas , Jeff Anders, Ryan Holmacher, James Greer, Mary Muse, Cathy A. Jess, Robert Hable, Gary Ankarlo, Hugh Johnson, Cindy O'Donnell, and Mark Wiegerber, were all members of the WDOC Gender Dysphoria Committee at all relevant times. Defendant Cindy O'Donnell was employed as the Secretary at all relevant times. At all relevant times, Defendants' each were a person for the purpose of 42 U.S.C. §1983, and acted under the color of state law to deprive Plaintiff of federal rights by persistently denying Plaintiff desperately needed medical necessary treatment, as set forth more specifically herein.

20.     Plaintiff reserves the right, consistent with all applicable rules and court orders to amend this Complaint to include additional officials should it become apparent that such officials' inclusion is necessary to grant the prospective injunction relief requested herein.

## ALLEGATIONS OF FACT

21.   Plaintiff repeats and re-allege the allegations contained in the preceding paragraphs as set forth and fully restated herein.

22.   Sometime in 2012, plaintiff requested that she be evaluated for Hormone Therapy, in order to get hormone treatment for her GD condition and symptoms, and was again evaluated by PSU staff, and after being evaluated for the second time by Dr. Leslie Beard, she made a recommendation to Dr. Garbleman, who was her supervisor, that plaintiff be seen by Dr. Cynthia Osborne, for a full evaluation for hormone therapy, and Dr. Garbleman made a recommendation to then Defendant Dr. Kevin Kallas, was the GID Committee Supervisor, which defendant Kallas made the appointment to have the plaintiff seen by Cynthia Osborne.

23.   After reviewing both Dr. Beard's and Dr. Garbleman's report, defendant Kallas made the recommendation to see Dr. Osborne for a full evaluation for hormone therapy. Dr. Osborne met with the plaintiff and conducted a full evaluation for the plaintiff which took more than 5 hours to complete, and when the interview was completed, Dr. Osborne told the plaintiff that she would be putting together a written report of her findings, and submitting her findings to the GIS Committee, along with her recommendation for treatment plan for the plaintiff. Sometime later in the year, Dr. Osborne summitte4d her report and finds, and made a recommendation to the GID committee, that plaintiff be approved for Hormone Treatment, and the GID committee agreed with the diagnosis made by Dr. Osborne, and sent the plaintiff her confirmation letter approving her treatment plan.

24.   Plaintiff contends that sometime on or about November 5, 2012, she was transferred to Racine Correctional Institution (RCI), where she would meet Dr. Steven

Brown, for the purpose of prescribing her Hormone Medication, per the recommendation of the GID committee, who would then prescribe the proper does of medication for the plaintiff. Plaintiff further contends that on or about January 3, 2013, she started her medication which consisted of (Estradiol, Spironolactone, Medydroxprogestone, Calcium Carbonate, Multivitamin with Iron,) and other medication to address her Dysphoria. On August 24, 2014, plaintiff was again transferred to another institution, which was Oshkosh Correctional Institution, wherein at that institution she was to see Dr. Betsy Luxford, who was the New Hormone Specialist for the Gender Dysphoria inmate like the plaintiff. During that time, Plaintiff made several request to Dr. Luxford, to be evaluated for Sex Reassignment Surgery (SRS), and was told that would have to make that request to her treating psychologist, Dr. Danielle Shellcross, who would then contact defendant Kallas, which the plaintiff followed her instructions.

25.     Plaintiff contends that from April 25, 2014 to February 8, 2015, she made several requests to be re-evaluated for SRS surgery, and Dr. Shellcross made the recommendation to defendant Kallas, who then made the appointment with Dr. Osborne again, for the plaintiff to be evaluated for Sex Reassignment surgery, and plaintiff met with Dr. Osborne to complete the interview. After the plaintiff met with Dr. Osborne, she again told the plaintiff that she was going to prepare another report and submit that report and her recommendation to the GID committee. Once the report was completed, Dr. Osborne made two (2) recommendations, the first recommendation was for the plaintiff to undergo a "Ochiectomy Surgery" and if that proved to be successful, then the second recommendation would be for the Full SRS, because in her opinion, the

plpaintiff would be a good candidate for that surgery. Dr. Osborne further recommended that prior to the Orchiectomy surgery, the plaintiff must get "Psychotherapy" treatment in order for the plaintiff to have the full understanding of what it was going to mean to become a full woman, because once the SRS is completed, there should be no regret, and the plaintiff cannot reverse the treatment, which the plaintiff agreed to do.

26.    After plaintiff consulted with Dr. Shellcross, plaintiff agreed to go through the surgery, and to show that she meant every word and clearly understood what it was she was getting into, the plaintiff drafted her own "Consent Form" and made several copies, of the drafted form, and sent one to Dr. Shellcross, for her PSU file, one to her primary Care Doctor, Dr. Patrick J. Murphy, to be placed in her Medical Files, and she retained a copy of the same document. However, plaintiff later learned that the GD Committee denied her treatment through a "Blanket Policy" and under then Executive Directive 68, which prohibited any kind of surgery procedures as long as the plaintiff is in the custody and control of the Wisconsin Department of Corrections, Plaintiff then filed a Inmate complaint, Complaint No. OCSI-2015-7121, challenging the prohibition policy and the denial of the Orchiectomy surgery, which was denied, she appealed the denial, but again, it was denied by the Office of the Secretary (OOS).

27.    Plaintiff then requested that she undergo the psychotherapy with Dr. Shellcross, and began her treatment that she agreed to, since it was very important that she get this counseling, which she was very glad to do. Plaintiff contends that she started her sessions sometime in June or July 2016, wherein some of the sessions were started prior to that date specified in her complaint, plaintiff further asserts that everything was going good until September 21, 2016, when plaintiff made a request for information

regarding the New Medical Doctor who was supposed to be hired to provide the second evaluation for those diagnosed with either Orchiectomy or Sex Reassignment Surgery, by the Name of Steven B. Levine, and because she requested his BIO, she received a Conduct Report, and charged with "Soliciting a Staff Member" which was a Major Conduct Report. Plaintiff contends that during one of her Sessions with Dr. Shellcross, there was a discussion about the New Doctor, and Dr. Shellcross told the plaintiff that she knew nothing about this doctor, and could not tell the plaintiff anything about him, the plaintiff told Dr. Shellcross that she'll have one of her family members look this New Doctor up on the internet, and when plaintiff get the information, she will share that information with Dr. Shellcross.

28.     When the plaintiff got the Email address from her family, she made out a Green PSU Request Slip, and provided the information of the slip to Dr. Shellcross, and requested what ever information she could provide to the plaintiff. The Plaintiff was called to the Administration building and when she arrived, she was given a Major Conduct report for Soliciting a staff, which was not what she did in the first place, this caused the plaintiff to stop going to get counseling from the only Doctor assigned to deal with the GID inmates, which caused the plaintiff to stop her counseling with Dr. Shellcross, in fear that what ever was discussed in session, she would be punished for it. When the plaintiff went to her Disciplinary Hearing, she was found Guilty of the violation and given a "Reprimand" for her actions, plaintiff tried to explain to the hearing officer that she did nothing wrong, and that she should not be found guilty, but the officer would hear none of it, and now the plaintiff has on her institutional record, a conduct report for soliciting, when it would not be, because prior to plaintiff requesting

information about the New Doctor, Dr. Shellcross told the plaintiff that if she wanted information to make sure that it was on a Green Slip (PSU-Slip), and if she wanted information concerning the GID committee, that she is to write the committee in Madison, Wisconsin, but to punish her for make her request and providing the address to her psychologist, is wrong, and unfair to the plaintiff. Plaintiff contends that during her August 8, 2016 9:30am session, she and Dr. Shellcross was discussing the New doctor (Dr. Levine), and based upon that session, plaintiff should not have been discipline for only requesting information she had the right to request, and to do so, sure lets the plaintiff know she can't get the counseling she needed in fear that what she say can be used against her later. In a Memorandum dated April 7, 2015, Dr. Shellcross sent out to all of the GID Inmates, informing them on the proper way to request information, and plaintiff followed that memorandum, and was punished for following it, that was abuse of authority by Dr. Shellcross.

29.    Plaintiff made several request from at the institutional level to be able to shower more than once a day, in that she and other transgender inmates felt that it was unfair that they be allowed only one shower a day, and filed a complaint against it see Inmate Complaint No. OSCI-2015-14455, which was dismissed, and plaintiff was never given another time to take showers, however, all of the other inmates were allowed as many shower as they want, and the transgender inmates had to wait until 10:00pm to take their showers, which shows discrimination against them for being transgender, and told that if they take a shower outside of the time allowed for them, it would be at their own risk, so plainitiff and other transgender inmates had to sit in dirty cloths for the whole day before they could take a proper shower. Plaintiff requested Make up, Hair Removal

products, to help get both body hair and facial hair off since "Magic Shave" was way to harsh for them to [put on their skin, and that was denied pursuant to the blanket policy DAI Policy 500.70.27, see Complaint No. OSCI-2015-7501. Plaintiff then made another request for her Orchiectomy Surgery, and again was denied, but the committee, see Complaint No. OSCI-2016-21187, and plaintiff asserts that other than Hormone Therapy, there is no other alternative medical treatment for her Gender Dysphoria, because of the blanket policy that WDOC insist on implementing, even though Executive Directive 68 was rescinded, the defendant placed the same restrictions in the New DAI Policy 500.70.27, which was against the Law, as cited in the Fields v. Smith, 712 F. Supp. 2d 830 (E.D. Wis. 2010); Fields, 653 F. 3d 550 (7th Cir. 2011).

30.    Plaintiff further asserts that she is consistently being denied and being told "Their Working On It, be Patient" every time she request to have her medical treatment done by the WDOC, and does asserts that this is a systematic custom and practice of the WDOC to deny treatment to the Transgender inmates like the plaintiff, in violation of their Constitutional Rights to fair treatment. The Defendants' are telling the plaintiff they are not denying her the treatment, they are not just giving her the required treatment, because its not an approved treatment under their policies and procedures and it is prohibited. Meanwhile, the plaintiff is suffering serious pain and discomfort, because she is very displeased with her male gentiles, whereas each day that goes by, she continue to suffer and only thinks about self mutilation, suicidal thoughts, and racing thoughts about harming herself, and a sheer displeasure with the male parts that she has, and is only getting worse by the day, she is very afraid of telling the PSU staff her thoughts, in fear that she'll be locked up in segregation for a long period of time, which is what

happens when inmates and prisoners share their feelings with staff, she is not allowed to life out the "Real Life Experience" (RLE), which is one of the three triads listed in the Standard of Care, under the WPATH, "International Journal of Transgenderism, which was created by the World Professional Association for Transgender Health Organization, titled Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, see attached Standards of Care Packet, because the written policy, rules and procedures prohibits it, and she is being told that she has to appear DAI Policy 500.70.27 clearly ask that all staff refer to the transgender community using "Gender Neutral Names", look like a boy, dress like a boy and act like a boy, while she is in a "Man's Prison" because she is in a man's prison, the correctional staff all refer to the plaintiff as either "Him, Man, or Sir" despite the fact that the DAI Policy 500.70.27,

31.    However, in the same policy, the policy allows the plaintiff and other transgender inmates to be able to use the prefix "Ms. Or Miss" on all of their correspondences, outgoing mail, and incoming mail, but she is not allowed any feminizing cosmetics, no make up of any kind, however, the policy allows the plaintiff to express her chosen gender, which is a contradiction to the policy but she can't look like her chosen gender, because if she does allow herself to look like a girl, she faces punishment by the administration for attempting to disguise her identify, and her hair must conform to that of a boy, and not that of a girl. Plaintiff further asserts that because of the way she must live, and the fact that there is no other alternative treatment for her condition, she has entered a severe stage of "Depression" to a point that she is on serious medication for her depression, stress, anxiety, and the more time kit takes the Defendants' to make up

their minds, on the kind of medical treatment to give the plaintiff, the further risk she will be in, and the need to self mutilate herself is great, and if she can't get the Orchiectomy or the sex reassignment surgery, then her only option will be to take her own life, because, she can't live like she is living, because she is not a boy, she is a Woman.

32.   When the plaintiff does go to segregation, there is no form of hair removal product available for her and she must grow a Beard and facial hair and only can get a hair cut once a month, otherwise she has to look like a man, which only adds to her depression, suffering and pain, all she gets from the Defendants' is **"there is nothing we can do, do the best you can"** attitude. This Blanket Policy that the Defendants' has put into place, is harming the plaintiff and nothing is being done to ease her pain, except she is being told to act like a man, because she is in a man's institution, and she can't be moved to a female institution, because she has male genitals. Plaintiff contends that from September 24 through March of 2017, she has made several request for treatment and have gotten none, except for hormone treatment, because of the DAI Policy 500.70.27.

33.   Plaintiff further states that the Fields case allowed the defendant to provide the treatment she needed, and told the Defendants' that they cannot limit medically necessary treatment, and SRS was part of the Law Suit filed in the Fields case, but the Defendants' refused to honor the language and directions of the High Court, and the Seventh Circuit Court of Appeals, because of the public image, and the false sense of security the Defendants' have about what the public will think, they are denying the plaintiff and other inmates who are transgender the right to be treated, and has refused to all the plaintiff to be treated with the only remedy available for her condition, and that

is the Sex Reassignment Surgery, with the Orchiectomy Surgery.  Plaintiff contends that the defendant have made it very clear, that Wisconsin Inmates will never get the treatment they deserve while they are in the custody of the WDOC, and that they have Legal Counsel who will see to it that the policies in place will stand, and no further treatment will be given except for counseling, that's it. She feel that the only way to ease her pain is to get the surgery she needs, and not excuses. (PPOF at 10, Compl. at 5, Pl. Aff'd. at )

34.    Plaintiff is very fearful for her safety especially after she was sexually assaulted and had to file a PREA against the inmate who assaulted her back on March 25, 2016, which is clearly documented, and every since that incident, plaintiff has been in fear of male inmates, and have expressed this fear to both institutional security staff, and her psychologist, and the outside counselor that she sees every two weeks, and the Defendants' have made it a point not to hear the cries of the plaintiff, but simply told the plaintiff, things like this happens, you just have to get over this, there is nothing we can do at this time, meanwhile, the plaintiff must suffer being housed in a cell with a male inmate, always in fear of her safety, which is not fair to her or any other transgender inmate. Plaintiff has learned that other transgender inmates such as her, already are in single cells, but for some reason, the plaintiff is isolated from them, housed in another building, and does not get to see any of the other transgender inmates, and when she asks to be place around other transgender inmates, her request is denied.

35.    All of the other transgender inmates are Caucasian and one Hispanic, and the plaintiff is the only African American Transgender inmate within her facility, and ever time she request from security staff to be housed with the other transgender inmates,

she is denied, and when she request to be single cell, she is being told that they don't do that in her present place of confinement, however, when the plaintiff check with other inmates on the other housing unit that houses the other transgender inmates, she is being told that all of them are in a single cell, but for some reason, the plaintiff is being singled out, and not being treated like the rest of the transgender and she is very convinced that because she is the only African American transgender inmate in her facility, it is for that reason why she cannot be housed with all of the other transgender inmate. She is being told by the institutional staff, that it is not related to her race, nor ethnic background, it's only a staffing problem, and when she went to her Center Program Supervisor and requested to be housed with the rest of the transgender inmates, she was told that she could not because it would cause a "Management Problem" when there are only 2-3 transgender inmates housed on Unit-8, and one Caucasian transgender housed on Unit-7, at the present time, she is the only transgender inmate on her unit, and most of the other inmates do not want to be housed with her simply because she is transgender.

36.    Plaintiff further asserts that a day does not go by when she feels segregated from the rest of the transgender inmates, nor does a day goes by when she feels the need to castrate herself in order for her to coupe with her present situation, and the Defendants' surely have presented an issue that her safety and mental health is not being addressed, and she is being told by the other correctional staff, that it's the way it is, and that they don't have the proper authority to make moves for the plaintiff, in order to accommodate her needs, but that it's up to the Center Program Supervisor (CPS), which at the present time, he does not feel moving the plaintiff with the other

transgender inmates is a good move, but have not expressed his decision to the plaintiff, and that plaintiff is relying on the unit correctional staff to provide her feed-back from the (CPS), because each time she makes her position known to her (CPS) all she get from him is that he's working on the matter. She consistently express to the other correctional staff that she feels unsafe by living with non-transgender inmate, which is solely based upon her fear that she will be sexually assaulted again, and will have to get more counseling, because putting her with non-transgender inmates, does pose a serious risk of further harm to her, and both security and the (CPS) are not looking into the matter in the plaintiff's point of view.

37.    Plaintiff further contends that with the DAI 500.72.27 policy, one of the criteria for placement of transgender inmate, is to get the transgender input relating to placement and possible housing, and the Defendants' have refused to involve the plaintiff into their decision making, and refuse to hear her cries for help, but keep citing WDOC policies that she don't get to pick who her cellmate is nor what housing unit she is placed in, and that what ever cellmate she gets, she has to live with it, and deal with it, because she is in prison. Plaintiff further asserts that at night, she has to wait until her cellmate goes to sleep first, before she can feel comfortable sleeping herself, and has to be the first one on the room to wake up, in fear that her cellmate with assault her because she has breast, it is those fears that the plaintiff feels that allowing her to be single celled could remedy the problem. Plaintiff also asserts that since she moved to her present place of confinement, she has had to fight with administration into getting all of the same treatment as the other transgender inmates, and especially with Health Service Unit (HSU) medical staff.

38.     Jackson was assigned male at birth but now identifies as a female. Jackson began feeling uncomfortable about being identified as a male at a young age. This manifested itself in Jackson feeling strongly that she was a female, playing with her sisters' dolls, and preferring to play and socialize with girls. She began wearing female clothing between the ages of five and six. Jackson often wore female clothing under her male clothing everywhere throughout her life.

39.     Jackson is the second oldest child, and has at the present time two brothers, and one sister. As a child, she identified closely with the women in her life, especially her mother Dorothy, and her sister Verna and Cheyenne. Jackson further contends that she was physically, emotionally, and verbally abusive by her father, and expressed discomfort when she was caught wearing cloths like a girl.

40.     Jackson's mother Dorothy was called to school one day during her high School years, because Jackson was caught using the female bathroom, and wearing girl cloths, which was one of the time Jackson was caught in girl cloths, in a public place.

41.     Jackson has identified as female and lived a double life when she was outside of prison, male by day, woman by night, until she made a decision to fully live her life as a female, albeit in a compromised form, since childhood. As Jackson got older, she would steal her sister Verna's birth-control pills, as an attempt to change her physical body appearance. That's when she began to understand that she needed to change into a full woman.

42.     Gender dysphoria is a recognized medical condition identified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*. DSM_V (5th ed. 2013).

43.    Gender dsyphoria is a serious health condition that involves a strong conflict between a person's physical gender, and the gender with which the person identifies and a persistent discomfort with the person's anatomical sex.

44.    The conflict between a person's gender identity and anatomical sex causes individuals with gender dysphoria extreme psychological distress.

45.    The World Professional Association for Transgender Health ("WPATH") is the leading professional association for medical professionals who specialize in the medical treatment of individuals with gender dysphoria. Based on decades of clinical experience and research, WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("SOC") which provide clinical guidance for medical professionals. WPATH's SOC are the prevailing standards for gender dysphoria, and apply equally to inmates and non-inmates.

46.    WPATH SOC dictates that treatment is medically necessary for people with gender dysphoria. The SOC further states that the therapeutic approach includes hormone therapy, living full-time as an individual for the gender matching one's identity, and Orchiectomy and SRS and that course of treatment may differ from person to person depending upon individualized medical evaluation. The SOC also recognizes that Orchiectomy and SRS is medically necessary for many people with gender dysphoria. In addition to the psychological and medical treatments involved in the therapeutic approach, the SOC recommends additional components of treatment to help alleviate gender dysphoria, including light make-up, electrolysis, and voice therapy.

47.    According to the WPATH SOC, vaginoplasty is one type of SRS procedure, and Orchiectomy is also another type of procedure used to treat male-to-female transgender patients. Vaginoplasty is also a surgical procedure used, when medically necessary, to

treat non-transgender females suffering from other medical conditions (for example, cystocele).

48.    Upon information and belief, the WDOC provides medically necessary treatment and surgeries to non-transgender females.

49.    On December 6, 2011, Plaintiff was first diagnosed with gender dysphoria by Dr. Lesley Baird, Psy.D. wherein a request was made to see Cynthia Osborne for the purpose of receiving evaluation for hormone therapy. On December 16, 2011, a gender specialist, Cynthia Osborne ("Osborne") evaluated Plaintiff for gender dysphoria and the possibility of hormonal treatment.

50.    On June 15, 2012 Osborne diagnosed Plaintiff with gender dysphoria after a careful evaluation, and made a recommendation that Plaintiff Receive Hormone Therapy, and sent her findings and recommendation to Kallas, to be submitted to the full Gender Dysphoria Committee.

51.    On July 24, 2012, Kallas, WDOC Mental Health Director, and the full Gender Dysphoria Committee informed Plaintiff that she was approved for hormonal treatment, and told the Plaintiff that she would see a "Hormone Specialist, a Dr. Steven M. Brown ("Brown") at a later date to be evaluated to see what hormone she would be starting. On January 3, 2013, Plaintiff was seen by Dr. Brown, and evaluated about what form of hormone she would be starting, and went over all of the ramifications related to taking feminizing hormones, and made sure that Plaintiff clearly understood what was involved in the process. Plaintiff signed the evaluation session noting that she understood the process.

52.    Plaintiff began hormonal treatment on January 29, 2013, which consisted of Estradiol ("Estrogen"), 3mg. daily, Spironolactone ("Testosterone Blocker") 100 mg. daily, a Multivitamin daily, Folic Acid 1 mg. daily, and Baby Aspirin 81 mgs. Daily. After

Plaintiff started her hormone therapy, Plaintiff made a request to see Osborne again for the purpose of getting evaluated for SRS treatment, and asked Shellcross to contact Kallas and make a referral to see Osborne which was done. On Decmeber 16, 2014, Plaintiff was seen by Osborne, and evaluated for SRS treatment, and after meeting with Osborne, she made a recommendation that Plaintiff undergo an Orchiectomy, prior to receiving the SRS, should the Orchiectomy prove successful. On January 14, 2015, Osborne sent her recommendation to Kallas and the full gender dysphoria recommending "Orchiectomy Surgry, with "Estrogen Injections", and her support for the SRS after Orchiectomy surgery was complete. Which was denied by the gender dysphoria committee, and Kallas.

53.    Plaintiff's hormone dosage were decreased and change to the Estradiol Patch, 1mg. daily, however, the hormone patch had a side affect on the plaintiff, and was breaking the plaintiff out on her stomach areas, and her oral form pills were reinstated, and increased to Estradiol 5mg. daily, but the spironolactone was not increased due to Plaintiff's over-all medical conditions. Plaintiff has been on this optimal level of hormones since January 2016. The WPATH SOC recommend one year of hormone therapy in order to qualify for Odrichectomy and SRS, which today, Plaintiff has been on hormones for more than four years, and meets all of the requirements necessary for both Orchiectomy and SRS Surgeries.

54.    Despite receiving hormone therapy, Jackson has continued to suffer from now severe gender dysphoria, which was her extreme mental distress. Jackson told Osborne of numerous suicidal thoughts, and everyday thoughts of self castration of her male gentiles, and expressed that not a day goes by when she does not think about cutting off her male gentiles in order to meet the appearance of a true female, which meant that Jackson would perform her own SRS on herself and expressed a desire to

1  end her life is she if the Defendants' continue to deny her access to both the
2  Orchiectomy Surgery and the SRS Surgery.

3  55.    Plaintiff made numerous formal and informal request for both the Orchiectomy
4  and SRS since starting hormones in January 2013, as set forth below.

5  56.    Plaintiff was called to Shellcross's office On February 9, 2015, to discuss the
6  recommendation for SRS and the Orchiectomy treatment made by Osborne.After
7  Plaintiff met with Shellcross, Plaintiff made her request for the Orchiectomy treatment,
8  wherein Shellcross told the Plaintiff that she'll call Kallas and let him know that she
9  Plaintiff wanted to get the treatment that was recommended for her by Osborne. On
10  September 9, 2016, Plaintiff first filed a Psychological Service Request (PSR)
11  requesting Orchiectomy and sent her own Consent Form to both the Mental Health
12  Service Unit, and the Medical Health Service Unit to be placed into her files, as proof
13  that she wanted the Treatment, and fully understood that was involved with the
14  procedures. She wrote to the Gender Dysphoria Committee, Kallas, and was denied by
15  the Committee.

16  57.    On April 17, 2015, Plaintiff wrote a Inmate Complaint alleging that she was being
17  denied her recommended Medically necessary treatment meaning the Orchiectomy
18  Surgery, and was denied as being Moot. On May 1, 2015, she appeal the decision to
19  the CCE located in WDOC's Headquarters, and was again denied by Gary Ankarlo.

20  58.    On January 21, 2015, Plaintiff made a request to Kallas concerning being
21  allowed to wear light make-up, an Electrolysis, and Hair Removal, her request was
22  denied. On Aprl 15, 2015, Plaintiff filed another Inmate Complaint ("ICI"), complaining
23  that she was being denied light make-up, electrolysis, and hair removal products, her IC
24  was denied. On April 16, 2015, she appealed that decision on May 13, 2015, and was

25

1  again denied by the ICE, Cindy O'Donnell, because it was a "Rejected Inmate
2  Complaint.

3  59.    On September 28 2016, Plaintiff again filed another ICI requesting that she be
4  allowed to get her recommended medically necessary treatment the Orchiectomy
5  Surgery, and was again denied, On November 6, 2016, Plaintiff Appealed that decision,
6  and again it was denied by the ICE Brad Hompe and the OOS Cindy O'Donnell.

7  60.    When Plaintiff spoke to her Psychologist Dr. Danielle Shellcross ("Shellcross")
8  about the denial of all her ICI on the matter of recommended medically necessary
9  treatments, she was told the Orchiectomy's and SRS surgeries was going to be denied
10 state-wide based on the impossibility of the achieving the "real life" experience in prison.
11 Plaintiff went through Dr. Danielle Shellcross every time she needed to relay a message
12 to Kallas, and each time she met with Shellcross, Plaintiff was told she would not be
13 getting her recommended treatment anytime soon, because it was not the policy or
14 directions that WDOC wanted to go.

15 61.    Plaintiff again through Dr. Shellcross, made several more request to speak to
16 Kallas and the Gender Dysphoria Committee, about her recommended medically
17 necessary treatment, and at all levels, she was denied.

18 62.    Prior to leaving the Oshkosh Correctional Institution ("OSCI") bound for Kettle
19 Moraine Correctional Institution ("KMCI"), Plaintiff made another request to Shellcross,
20 that she be re-evaluated for the full endorsement for SRS surgery, based upon
21 Plaintiff's understanding of the procedures, and her readiness to take the next step. She
22 heard nothing further about her request, and once at her new facility KMCI, she made
23 another request to be re-evaluated for fully SRS endorsement.

24 63.    After Jackson's last meeting with Osborne, Jackson made it clear that Jackson
25 had been living as a woman most of her adult life, and when Osborne asked Plaintiff if

1  she won a Lottery, what would be the first thing she would buy with her winnings, and
2  Plaintiff replied;" I get My Sex Change Completed, with no questions asked." Plaintiff
3  also told Osborne that the reason for stealing her sister's birth-control pills was so that
4  she could attempt to get a woman's body, because all of the studies she did and the
5  research she did told her that it was the safest was to get the body she wanted without
6  self harming herself.

7  64.    On August 6, 2017, Plaintiff wrote a PSR to her psychologist requesting her
8  recommended Orchiectomy surgery, and her request for another SRS re-evaluation to
9  see Osborne, and to be allowed to wear light make-up, voice therapy, Hair Removal
10  Products.

11  65.    The Gender Dysphoria Committee consistently denies Jackson's request for
12  Orchiectomy and SRS by citing WDOC Division of Adult Institutions Policy 500.70.27,
13  which states, "due to the limitations inherent is being incarcerated, a real-life experience
14  for the purpose of gender-reassignment therapy is not possible for inmates who reside
15  within a correctional facility."

16  66.    However, treatment and accommodations may be provided within the
17  correctional facility to lessen gender dysphoria. "DAI Policy 500.70.27,3 (2015) This
18  policy is contrary to the WPATH SOC, which states, "The SOC in their entirety apply to
19  all transsexual, transgender, and gender-nonconforming people, irrespective of their
20  housing situation. People should not be discriminated against in their access to
21  appropriate health care based on where they live, including institutional environments
22  such as prisons or long-/intermediate-term health care facilities." Eli Coleman et al.,
23  Standards of Care for Health of Transsexual, Transgender, and Gender-Nonconforming
24  people, Version 7, the World Professional Association of Transgender Health, 67
25  (2011).

67.    Jackson's persistent requests for Orchiectomy and SRS and Osborne's independent evaluation of Jackson demonstrates that Defendants' were fully aware of the substantial risk of serious harm associated with denying Orchiectomy and SRS for Jackson's diagnosed severe gender dysphoria. Defendants' consciously disregarded this risk  by denying Jackson's multiple requests for Orchiectomy and SRS treatment and failing to take reasonable measures to address the ongoing mental distress that Plaintiff has beed suffering as a result of her gender dysphoria, which has not been fully addressed by the feminizing hormone therapy that Plaintiff had been receiving for over four years. Defendants' have been consciously and deliberately indifferent to Plaintiff's medical needs and complaints by failing and refusing to treat Plaintiff with appropriate and necessary surgery, which has resulted in Plaintiff experiencing unnecessary mental distress, among other adverse consequences.

68.    Based on the aforementioned repeated request for Orchiectomy and SRS, Plaintiff has exhausted all of the available administrative remedies within the WDOC.

## FIRST CAUSE OF ACTION

### (42 U.S.C. §1983: Deprivation of Eighth Amendment Rights)

69.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraph as if fully set forth and restated herein.

70.    Plaintiff begins this cause against Defendants' in their official and personal capacity pursuant to 42 U.S.C. §1983 for damages caused by Defendants'' deprivation of Plaintiff's constitutionally protected rights b y reason of Defendants'' continued violation of Plaintiff's substantial rights pursuant to the Eighth Amendment of the Constitution of the United States of America.

71.    Plaintiff has been diagnosed with the serious medical condition of severe gender dysphoria which, despite four years of feminizing hormone therapy, continues to cause

1 serious mental and emotional distress. Plaintiff requires medicall necessary
2 Orchiectomy and SRS treatment as recommended by Osborne and supported by
3 Plaintiff's records and the prevailing medical standards of care.

4 72.    Each Defendant was at all relevant times employed by the WDOC, and as such,
5 was acting in his or her official capacity and under the color of state law.

6 73.    Defendants' conduct demonstrates conscious and deliberate indifference to
7 Plaintiff's serious medical needs and violates the Eighth Amendment's prohibition on
8 cruel and unusual punishment.

9 74.  .  By failing to provide Orchiectomy and SRS to Plaintiff, Defendants' have
10 deprived Plaintiff of her right to medically necessary treatment guaranteed under the
11 Eighth Amendment to the United States Constitution.

12 75.    Defendants'' persistent denial of Orchiectomy and SRS is causing irreparable
13 harm to Plaintiff. As a direct and proximate result of Defendants'' purposeful and
14 intentional actions, Plaintiff has suffered and continues to suffer injury, including, without
15 limitation, serious physical, psychological and emotional harm, mental anguish, distress,
16 humiliation, and indignity.

17 76.    Further, the constitutional violations of Defendants'', as described above, were
18 outrageous and malicious, because of their conscious disregard and reckless
19 indifference to the rights of Plaintiff, thereby warranting an award of punitive damages
20 against Defendants'.

21                    **SECOND CAUSE OF ACTION**

22 **(42 U.S.C. §1983: Deprivation of Fourteenth Amendment Equal Protection Rights)**

23 77.    Plaintiff repeats and re-alleges each and every allegation in the preceding
24 paragraph as if fully set forth and restated herein.

25

78.   Under the medical standards established in the WPATH SOC, a transgender individual should achieve a real-life experience-that is, "12 continuance months of living in a gender role that is congruent with their gender identity"-before receiving Orchiectomy and SRS, including vaginoplasty. SOC at 60.

79.   The WPATH SOC further states, "The SOC in their entirety apply to all transsexual, transgender, and gender-nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities." SOC at 67.

80.   DAI policy 500.70.27 provides that "due to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who resides within a correctional facility." DAI Policy 500.70.27.

81.   By arbitrarily foreclosing an inmate's ability to achieve a real-life experience, DAI Policy 500.70.27 effectively bars any transgender inmate from receiving Orchiectomy and SRS (including vaginoplasty), irrespective of medical necessity or whether Orchiectomy and SRS would otherwise be considered appropriate under the WPATH SOC.

82.   The regulatory scheme discriminates on the basis of sex. Whereas biological female inmates are able to receive medically necessary vaginoplasty (for example, to treat cystocele), similar situated biological male inmates are not able to receive-or face higher hurdles to receive-medically necessary vaginoplasty (for example, to treat gender dysphoria). This difference in treatment is not substantially related to achievement of an important governmental objective.

83.   Defendants' relied on this regulatory scheme to intentionally discriminate against Plaintiff on the basis of sex and transgender status. In considering Plaintiff's needs for

Orchierctomy and SRS, Defendants' failed to give proper consideration to the specific circumstances of Plaintiff's gender dysphoria and need for Orchiectomy and SRS but instead based their conclusions on factors and processes that they would not have considered in determinating the medical necessity of a treatment for a similarly situated biological female or non-transgender inmate's request for medically necessary treatment.

84.   Even apart form Defendants' particular reliance on Dai Policy 500.70.27, Defendants' denial of Orchiectomy and SRS to Plaintiff' discriminates on the basis of sex and transgender status in a way that is neither substantially related to the achievement of an important governmental objective nor rationally related to a legitimate governmental interest.

85.   Each Defendant was at all relevant times employed by the WDOC, and as such, was acting in his or her official capacity and under the color of state law.

86.   Defendants' persistent denial of Orchiectomy and SRS is causing irreparable harm to Plaintiff. As a direct and proximate result of Defendants' purposeful and intentional actions, Plaintiff has suffered and continues to suffer injury, including, without limitation, serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

87.   By failing to provide Orchiectomy and SRS to Plaintiff while incarcerated, Defendants' have deprived Plaintiff of her right to equal protection under the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

88.   Relevant to housing for all transgender prisoners at the (KMCI) and all WDOC facilities, plaintiff has been housed with non-transgender prisoners, in direct violation of the DAI Policy 500.70.27, Section VI, Subsection A, which states that facility housing shall be made on a case by case basis, considering the inmate's health and safety as

1   well as potential programming management and security concerns. An inmate's own

2   views regarding safety shall be given careful consideration. Defendant Sabish failed to

3   take these measures into consideration relating to plaintiff's cell-mates, and many of the

4   cell-mate that plaintiff has had, were not consistent with the proposed policy, and placed

5   plaintiff in a unsafe environment that has affected her mental stage and distress.

6   Plaintiff was told by defendant Sabish that she did not have much say into whom she is

7   to be celled up with at her present institution, and as such, this lack of consideration has

8   caused the plaintiff enormous stress and mental anguish, because it is clear that

9   plaintiff's safety and health is not being considered in this case, as directed by written

10  WDOC Policies..

## **PRAYER FOR RELEIF**

12      WHEREFORE, Plaintiff prays for Judgment under her cause of action in favor of

13  Plaintiff and against Defendants:

14      (a) Awarding Plaintiff preliminary and permanent injunctive relief in the form of a

15          court order directing Defendants' to provide Plaintiff with the necessary

16          medical care, including Orchiectomy and SRS, and other appropriate

17          treatment, including light make-up, electrolysis, and voice therapy;

18      (b) Awarding compensatory and punitive damages for Plaintiff's injuries,

19          including, without limitation, Jackson's serious physical, psychological and

20          emotional harm, mental anguish, distress, humiliation, and indignity, in an

21          amount to be determined by the Court.

22      (c) Awarding costs for the Suit herein, including Plaintiff's reasonable attorneys'

23          fees and expert fees pursuant to 42 U.S.C. §1988; and

24      (d) Awarding all other relief that the Court deems just and proper.

25

Dated this 10ᵗʰ day of September 2017

Respectfully submitted by:

/s/ *[signature]*

Ms Lonnie Jackson , a/k/a

Ms. Anasticia Sabrina-Loni
Jackson, Plaintiff Pro Se