UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

LONNIE L. JACKSON, A/K/A
ANASTACIA SABRINA-LONI JACKSON,

      Plaintiff,

  v.

KEVIN KALLAS,
JEFF ANDERS,
MARLENA LARSON,
JOHN DOE,
JAMES ZANON,
PAUL BEKX,
KEVIN CARR,
MARY MUSE,
AMY PECHACEK,
and
LARRY FUCHS,

      Defendants.

Case No. 17-cv-350-bbc

---

### PLAINTIFF'S SECOND AMENDED COMPLAINT UNDER
### THE CIVIL RIGHTS ACT 42 U.S.C. 1983

---

    COMES NOW, Plaintiff Lonnie Jackson, a/k/a Anastacia Sabrina-Loni Jackson, ("Plaintiff" or "Ms. Jackson") by and through her undersigned counsel, and for her Second Amended Complaint against Defendants Kevin Kallas ("Kallas"), Jeff Anders ("Anders"), Marlena Larson ("Larson"), John Doe ("Doe"), James Zanon ("Zanon"), Paul Bekx ("Bekx"), Amy Pechacek ("Pechacek"), Mary Muse ("Muse"), Kevin Carr ("Carr"), and Larry Fuchs ("Fuchs") (collectively "Defendants"), states as follows:

## NATURE OF ACTION

1. This is an action by Ms. Jackson, a transgender male-to-female inmate in the custody of Waupun Correctional Institution ("WCI"), whose constitutional rights have been and continue to be violated by the Defendants' continued and consistent deliberate indifference to Ms. Jackson's medical needs.

2. Plaintiff brings this civil rights action under 42 U.S.C. § 1983 to seek declaratory and prospective injunctive relief to redress Defendants' failure to provide Ms. Jackson with medically necessary sex reassignment surgeries ("SRS"), and other treatments in violation of Jackson's rights under the Eighth Amendment to the United States Constitution. Ms. Jackson also seeks attorneys' fees and costs from Defendants.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws and Constitution of the United States, and 28 U.S.C. § 2201, as an actual controversy exists within this Court's jurisdiction.

4. Venue is proper in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391, because the majority of the events giving rise to this action occurred in this district and because Defendants are subject to personal jurisdiction in this district.

5. The Court has authority under 42 U.S.C. § 1988 to award attorneys' fees and costs to successful civil rights plaintiffs.

## PARTIES

6. Ms. Jackson is a citizen of Wisconsin currently housed at Waupun Correctional Institution ("WCI"), located at 200 S. Madison Street, Waupun, Wisconsin 53963.

7. Ms. Jackson is a transgender woman, meaning that she was born anatomically male, but has a female gender identity and requires medical treatment to better conform her body to that gender identity. She experiences gender dysphoria and mental distress because of the conflict between her male anatomical features and her female gender identity. Ms. Jackson first began feminizing hormone therapy in December 2012 as a component of treatment for her gender dysphoria, yet she still suffers from gender dysphoria and Defendants continue to refuse to allow Ms. Jackson to receive medically necessary surgery.

8. Upon information and belief, Defendant Kallas is a resident of Wisconsin and an adult citizen of the United States. Kallas is employed as the Mental Health Director for the Bureau of Health Services for the Wisconsin Department of Corrections ("WDOC") and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Kallas had the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Kallas for declaratory and injunctive relief in his official capacity.

9. Upon information and belief, Defendant Anders is a resident of Wisconsin and an adult citizen of the United States. Anders is employed as the Psychiatry Director for the Bureau of Health Services for WDOC and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Anders has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Anders for declaratory and injunctive relief in his official capacity.

10. Upon information and belief, Defendant Bekx is resident of Wisconsin and an adult citizen of the United States. Bekx is employed as the Medical Director for the Bureau of Health Services for the WDOC and is a member of the Gender Dysphoria Committee for the WDOC at all relevant times. Upon information and belief, at all material times, Bekx has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Bekx for declaratory and injunctive relief in his official capacity.

11. Upon information and belief, Defendant Doe is a resident of Wisconsin and an adult citizen of the United States. Doe is employed as the Director of the Bureau of Health Services for the WDOC and is a member of the Gender Dysphoria Committee for the WDOC. The position was previously held by James Greer. Upon information and belief, at all material times, Doe has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Doe for declaratory and injunctive relief in their official capacity.

12. Upon information and belief, Defendant Muse is a resident of Wisconsin and an adult citizen of the United States. Muse is employed as the Nursing Director of Health Services for the WDOC and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Muse has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Muse for declaratory and injunctive relief in his official capacity.

13. Upon information and belief, Defendant Pechacek is a resident of Wisconsin and an adult citizen of the United States. Pechacek is employed as the Deputy Secretary of the WDOC. Upon information and belief, at all material times, Pechacek has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Pechacek for declaratory and injunctive relief in his official capacity.

14. Upon information and belief, Defendant Zanon is a resident of Wisconsin and an adult citizen of the United States. At all relevant times, Zanon is employed as the WDOC Deputy Warden for Oshkosh Correctional Institution and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Zanon has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Zanon for declaratory and injunctive relief in his official capacity.

15. Upon information and belief, Defendant Larson is a resident of Wisconsin and an adult citizen of the United States. At all relevant times, Larson is employed by the WDOC and was a member of the Gender Dysphoria Committee. Upon information and belief, at all material times, Larson has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Larson for declaratory and injunctive relief in his official capacity.

16. Upon information and belief, Defendant Carr is a resident of Wisconsin and an adult citizen of the United States. Carr is employed as the Secretary for the WDOC at all relevant times. Upon information and belief, at all material times, Carr has ultimate authority for

the operation of the WDOC, including the administration of health care for the inmates. Plaintiff sues Carr for declaratory and injunctive relief in her official capacity.

17. Upon information and belief, Defendant Fuchs is a resident of Wisconsin and an adult citizen of the United States. At all material times, Fuchs is employed as the Security Chief for the WDOC and is a member of the Gender Dysphoria Committee for the WDOC. Upon information and belief, at all material times, Fuchs has the authority to implement state laws regarding the treatment of inmates at WDOC facilities, including evaluating prisoner health care issues and denying or granting relief requested by inmates. Plaintiff sues Fuchs for declaratory and injunctive relief in his official capacity.

18. The WDOC Gender Dysphoria Committee was established under WDOC Division of Adult Institutions Policy 500.70.27. The purpose of the Gender Dysphoria Committee is to evaluate claims from inmates with gender dysphoria and to determine the necessary method of treatment. Defendants Anders, Larson, Doe, Bekx, Pechacek, Kallas, Muse, Fuchs, and Anders are all members of the WDOC Gender Dysphoria Committee at all relevant times. Defendant Carr is employed as the Secretary for the WDOC at all relevant times. At all relevant times, Defendants were each a person for the purposes of 42 U.S.C. § 1983 and acted under color of state law to deprive Plaintiff of federal rights by persistently denying Plaintiff desperately needed and medically necessary treatment, as set forth more specifically herein.

19. Plaintiff reserves the right, consistent with all applicable rules and court orders, to amend this Complaint to include additional officials should it become apparent that such officials' inclusion is necessary to grant the prospective injunctive relief requested herein.

## ALLEGATIONS OF FACT

20. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth and fully restated herein.

21. Ms. Jackson was assigned male at birth but now identifies as a female. Ms. Jackson became aware that she was different from her male peers when she was five or six years old. This manifested itself in Ms. Jackson feeling strongly that she was a female, playing with her sisters' dolls, wearing makeup, and preferring to play and socialize with girls. She began wearing female clothing between the ages of seven and eight. Ms. Jackson was not allowed to wear female clothing inside the house, so she would leave the house dressed in male clothing and change into female clothing at a nearby restaurant.

22. Ms. Jackson is the third of seven children. Ms. Jackson learned how to "live as a woman" from his sister, Verna, who would often buy women's clothing for her. When Ms. Jackson was older, her uncle helped her make feminine clothing choices.

23. Ms. Jackson had several female friends in school who would buy her mini-skirts and other female clothing.

24. Ms. Jackson first spoke with her mother about her gender identity preferences when she was approximately fourteen-to-fifteen years old. At this point, Ms. Jackson stopped hiding her gender preference from her mother.

25. When Ms. Jackson was fourteen years old, she was sexually assaulted twice by a close male family member. She recounted being "singled out" and targeted "because she was transgender" and received numerous gifts in the form of underwear and feminine clothes from her abuser.

26. On numerous occasions, Ms. Jackson took her sister's birth control pills.

27. Ms. Jackson has lived as a woman since she was thirty-two years old.

28. Ms. Jackson began the process of evaluation for gender dysphoria at approximately age thirty-four. She saw a physician twice, but the process was interrupted by her incarceration.

29. Ms. Jackson currently fashions her own feminine undergarments by cutting men's underwear to make a bra and panty sets in an attempt to continue living as a woman while incarcerated.

30. Gender dysphoria is a recognized medical condition identified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*. DSM-V (5th ed. 2013).

31. Gender dysphoria is a serious health condition that involves a strong conflict between a person's physical gender and the gender with which the person identifies and a persistent discomfort with the person's anatomical sex.

32. The conflict between a person's gender identity and anatomical sex causes individuals with gender dysphoria extreme psychological distress.

33. The World Professional Association for Transgender Health ("WPATH") is the leading professional association for medical professionals who specialize in the medical treatment of individuals with gender dysphoria. Based on decades of clinical experience and research, WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("SOC") which provide clinical guidance for medical professionals. WPATH's SOC are the prevailing standards for gender dysphoria, and apply equally to inmates and non-inmates.

34. The WPATH SOC dictates that treatment is medically necessary for people with gender dysphoria. The SOC further states that the therapeutic approach includes hormone therapy, living full-time as an individual of the gender matching one's identity, and SRS, and that the course of treatment may differ from person to person depending upon individualized medical evaluations. The SOC also recognizes that SRS is medically necessary for many people with gender dysphoria. In addition to the psychological and medical treatments involved in the therapeutic approach, the SOC recommends additional components of treatment to help alleviate gender dysphoria, including light make-up, electrolysis, and voice therapy.

35. Ms. Jackson's records reflect varying diagnoses provided by psychological services since July 22, 2003, with a rule out diagnosis of Gender Identity Disorder[1] ("GID") suggested on December 7, 2009 and a firm diagnosis of GID documented on December 22, 2009. This diagnosis has been consistently documented ever since that date.

36. Ms. Jackson first disclosed her desire to explore her transgender identity in a Psychological Services Clinical Contact dated March 15, 2006, although there were other references to her sexuality and sexual orientation made prior to that, it was during this discussion that Ms. Jackson asked, "how to go about becoming a woman." This was the first clear suggestion of Ms. Jackson having GID.

37. Ms. Jackson's first documented request for hormone therapy and counseling for her gender dysphoria came in the form of a Psychological Service Request ("PSR") dated August 1, 2008.

38. Thereafter, Ms. Jackson met with her clinicians on a numerous occasions to both request and inquire about treatment for GID, and following up on requests for hormone therapy.

---

[1] Gender Identity Disorder was renamed Gender Dysphoria in 2013 with the release of the Diagnostic and Statistical Manual of Mental Disorders (5th Edition).

39. Because Ms. Jackson never received a response to her first PSR, she submitted another PSR on January 18, 2011.

40. On October 20, 2011, Ms. Jackson sought information regarding when her hormone treatment would begin because she was having dreams and thoughts about removing her genitals to complete her transition to becoming a woman. She provided, "I need to get out of this man's body."

41. On December 6, 2011, a Psychological Associate and Waupun Correctional Institution Evaluator, Lesley Baird ("Baird") evaluated Ms. Jackson to assist in determining whether the use of hormone therapy would be a recommended addition to Ms. Jackson's treatment plan. At the conclusion of her evaluation, Baird determined that Ms. Jackson met the criteria for GID.

42. On December 15, 2011, a gender specialist, Cynthia Osborne ("Osborne"), evaluated Ms. Jackson for gender dysphoria and the possibility of hormonal treatment during a five-hour long consultation.

43. In Osborne's subsequent Gender Identity Consultation Report, dated June 15, 2012, Osborne diagnosed Ms. Jackson with gender dysphoria, and recommended that Ms. Jackson begin hormone therapy and concurrently participate in supportive counseling. Osborne also recommended that the DOC consider other feminizing allowances, including make-up, and requested that staff address Ms. Jackson in her preferred feminine name and pronouns.

44. On July 31, 2012, Kallas, WDOC Mental Health Director, informed Plaintiff that she was approved for hormonal treatment.

45. Ms. Jackson began hormonal therapy on or about December 25, 2012, which consisted of Estrace (Estrogen) 4 mg daily, Medydroxprogestone, (Estrogen) 10 mg daily,

Prometrium (Estrogen) 100 mg daily, Spironolactone (Testosterone Blocker) 100 mg daily, Calcium Carbonate 1000 mg daily, Folic Acid 1 mg daily, and a multivitamin with iron daily.

46. On January 21, 2013, Ms. Jackson began taking Estradiol (Estrogen), 4 mg daily, instead of Estrace.

47. On May 28, 2014, because of health concerns, Ms. Jackson was switched from Estradiol tablets, 4 mg daily, to the Estradiol patch 0.1 mg, twice per week.

48. On June 18, 2014, Ms. Jackson's daily dosage for Spironolactone was increased from 50 mg twice a day to 100 mg twice a day. On January 9, 2015, however, after a consultation with Betsy Luxford ("Luxford"), a hormone specialist and psychiatrist, Ms. Jackson's dosage of Spironolactone was decreased due to health concerns.

49. On August 3, 2014, Ms. Jackson made a Health Service Request to increase Estradiol back to 4 mg.

50. On August 4, 2014, Ms. Jackson's Estradiol request was denied due to high health risks.

51. Ms. Jackson has continued to experience the severe effects of GID, partially due to the lowering of her estrogen dosages.

52. On November 4, 2014, Ms. Jackson began psychotherapy with Dr. Danielle Shallcross ("Shallcross"), a psychiatrist.

53. Ms. Jackson has made numerous formal and informal requests for SRS since starting hormones in December 2012.

54. On December 16, 2014, Osborne reevaluated Ms. Jackson with the purpose of determining whether she was a candidate for SRS. Osborne's evaluation of Ms. Jackson makes clear that she had been living as a female most of her life and receiving feminizing hormone

therapy for over two years, but still experienced severe distress as a direct result of the discrepancy between her male sex characteristics and her female gender identity. Based on this evaluation, Osborne recommended SRS for Ms. Jackson on January 14, 2015. She noted that Ms. Jackson's anatomic dysphoria will be difficult to resolve without SRS. Osborne also noted, based on her medical risks, Ms. Jackson may be an "especially appropriate candidate for a surgical intervention." It was during this evaluation that Osborne also suggested an orchiectomy as an alternative to full SRS as it would allow for lower doses of estrogen, resulting in significantly lower medical risks.

55. On January 21, 2015, Ms. Jackson wrote to the Gender Dysphoria Committee requesting the medically necessary SRS surgery, electrolysis, and light make-up.

56. On February 10, 2015, Ms. Jackson drafted a consent form and delivered it to Shallcross stating that she fully understood all the risks and pain involved in SRS and consented to the surgeries.

57. On April 16, 2015, Ms. Jackson filed an "Offender Complaint" requesting light make-up and electrolysis to mitigate the effects of her gender dysphoria. On April 30, 2015, the Institution Complaint Examiner ("ICE") recommended that Ms. Jackson's request for light make-up be denied. The ICE did not address her request for electrolysis. On May 8, 2015, Ms. Jackson's request for light make-up was denied. The denial did not address Ms. Jackson's request for electrolysis.

58. On May 13, 2015, Ms. Jackson filed an appeal of the May 8, 2015 denial for light makeup. On July 24, 2015, Ms. Jackson's appeal was denied by Cindy O'Donnell ("O'Donnell"), former Deputy Secretary at the WDOC.

59. Ms. Jackson filed another "Offender Complaint," also on April 16, 2015, highlighting the Gender Dysphoria Committee's lack of response to her January 1, 2015 complaint requesting the medically necessary SRS surgery to treat her GID. This Complaint was ultimately denied on April 17, 2015 as premature because the Gender Dysphoria Committee had not yet made a decision. Ms. Jackson appealed this decision on April 30, 2015, and her appeal was denied on May 4, 2015.

60. On May 5, 2015, Ms. Jackson filed an "Offender Complaint" regarding the Gender Dysphoria Committee's denial of her request for electrolysis. Having received no answer to her Complaint, she filed an "Inmate Complaint Appeal" on July 9, 2015. On July 22, 2015, the ICE dismissed the Complaint on the basis that the ICE lacked the authority to review decisions made by the Gender Dysphoria Committee. On August 17, 2015, O'Donnell dismissed the July 9, 2015 appeal.

61. On July 10, 2015, Luxford stated that, based on Ms. Jackson's collective medical diagnoses, she did not recommend increasing Ms. Jackson's hormone dosages. Instead, Luxford recommended that Ms. Jackson undergo an orchiectomy, after which Ms. Jackson could discontinue spironolactone and instead be provided a low estrogen dosage to achieve maximum feminization effects.

62. On September 28, 2016, Ms. Jackson filed an "Offender Complaint" regarding the Gender Dysphoria Committee's apparent denial – because they had not yet responded to – her request for SRS per Osborne's recommendation for treatment. Despite Osborne's and Luxford's recommendations, the Gender Dysphoria Committee denied Ms. Jackson the medically necessary treatment on November 2, 2016.

63. On November 6, 2016, Ms. Jackson appealed the Committee's denial of her necessary SRS treatment. On November 28, 2016, the Corrections Complaint Examiner recommended denial of Ms. Jackson's Complaint based on DAI policies. On December 16, 2016, O'Donnell denied Ms. Jackson's appeal.

64. Despite her ongoing hormone therapy and psychotherapy, Ms. Jackson continues to suffer from severe gender dysphoria. There are numerous reports of Ms. Jackson's thoughts of self-castration and occasional thoughts of suicide as a result of her gender dysphoria. She has experienced and continues to experience depression, difficulty sleeping, and at times, loss of appetite.

65. In total, Plaintiff has been suffering from GID for *at least* the past fourteen years.

66. The Gender Dysphoria Committee consistently denies Ms. Jackson's requests for SRS by citing WDOC Division of Adult Institutions Policy 500.70.27, which states, "due to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who reside within a correctional facility. However, treatment and accommodations may be provided within the correctional facility to lessen gender dysphoria." DAI Policy 500.70.27, 3 (2015). This policy is contrary to the WPATH SOC, which states, "The SOC in their entirety apply to all transsexual, transgender, and gender-nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long/intermediate-term health care facilities." Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, The World Professional Association for Transgender Health, 67 (2011).

67. Upon information and belief, the Gender Dysphoria committee has denied all SRS requests made by incarcerated individuals who have been deemed eligible for SRS.

68. Defendants have admitted, on several occasions, that the "real-life experience" is a clinical concept that can only be fully realized in a community setting, and, despite suggesting that this language does not rule out the possibility that the DOC provide accommodations within the correctional setting that are medically necessary for GID, continue to incorporate this language in DAI policy 500.70 and deny the medically necessary SRS for appropriate candidates based on this language.

69. Plaintiff's persistent requests for SRS and Osborne's and Luxford's independent evaluations of Plaintiff demonstrate that Defendants were fully aware of the substantial risk of serious harm associated with denying SRS treatment for Plaintiff's diagnosed condition of gender dysphoria. Defendants consciously disregarded this risk by denying Ms. Jackson's multiple requests for SRS and failing to take any reasonable measures to address the ongoing mental distress that Plaintiff has been suffering as a result of her gender dysphoria, which has not been fully addressed by the feminizing hormone therapy that Plaintiff has been receiving for over seven years. Defendants have been consciously and deliberately indifferent to Ms. Jackson's medical needs and complaints by failing and refusing to treat Ms. Jackson with appropriate and necessary surgery, which has resulted in her experiencing unnecessary mental distress, among other adverse consequences.

70. Based on the aforementioned repeated requests for SRS, Plaintiff has exhausted all of the available administrative remedies within the WDOC.

## CLAIM FOR RELIEF

71. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth and restated herein.

72. Plaintiff brings this cause of action against Defendants in their official capacity pursuant to 42 U.S.C. § 1983 for damages caused by Defendants' deprivation of Plaintiff's constitutionally protected rights by reason of Defendants' continued violation of Plaintiff's substantive rights pursuant to the Eighth Amendment of the Constitution of the United States of America.

73. Plaintiff has been diagnosed with the serious medical condition of gender dysphoria which, despite over seven years of feminizing hormone therapy, continues to cause serious mental and emotional distress. Plaintiff requires medically necessary SRS treatment as recommended by Osborne and supported by Plaintiff's records and the prevailing medical standards of care.

74. Each Defendant was at all relevant times employed by the WDOC, and as such, was acting in his or her official capacity and under color of state law.

75. Each and every Defendant was aware of Plaintiff's medical need for SRS and overlooked Plaintiff's need, failing to take any measures to address Plaintiff's continued pain and suffering and mental distress.

76. Defendants' conduct demonstrates conscious and deliberate indifference to Plaintiff's serious medical needs and violates the Eighth Amendment's prohibition on cruel and unusual punishment.

77. By failing to provide SRS to Plaintiff, Defendants have deprived Plaintiff of her right to medically necessary treatment guaranteed under the Eighth Amendment to the United States Constitution.

78. Defendants' continued implementation of DAI Policy 500.70, specifically with respect to the language requiring a "real-life experience" for inmates diagnosed with gender dysphoria to receive SRS, acts as a blanket ban on SRS, resulting in the deprivation of Plaintiff's right to medically necessary treatment guaranteed under the Eighth Amendment to the United States Constitution.

79. Defendants' persistent denial of SRS is causing irreparable harm to Plaintiff. As a direct and proximate result of Defendants' purposeful and intentional actions, Plaintiff has suffered and continues to suffer injury, including, without limitation, serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment under her cause of action in favor of Plaintiff and against Defendants:

(a) Awarding Plaintiff preliminary and permanent injunctive relief in the form of a court order directing Defendants to provide Plaintiff with the necessary medical care, including SRS, orchiectomy and other appropriate treatment, including light make-up, electrolysis, and voice therapy;

(b) Awarding costs for the suit herein, including Plaintiff's reasonable attorneys' fees and expert fees pursuant to 42 U.S.C. § 1988; and

(c) Awarding all other relief that the Court deems just and proper.

Dated this 13th day of February, 2020.

                                        HUSCH BLACKWELL LLP
                                      Attorneys for Lonnie L. Jackson, a/k/a
                                        Anastacia Sabrina-Loni Jackson

                                    By:   s/ Thomas P. Heneghan
                                            Thomas P. Heneghan
                                            WI State Bar No.: 1024057
                                            Skye P. Parr
                                            WI State Bar No.: 1105245
                                            Catarina A. Colón
                                            WI State Bar No.: 1104696

P.O. ADDRESS:
33 E. Main Street, Suite 300
P.O. Box 1379
Madison, Wisconsin 53701-1379
608.255.4440
608.258.7138 (fax)
Tom.Heneghan@huschblackwell.com
Skye.Parr@huschblackwell.com
Catarina.Colon@huschblackwell.com